United States Court of Appeals,

Fifth Circuit.

No. 93-3590.

Boyce W. CHILDS, Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant-Appellee,

v.

Bruce C. WALTZER, Movant-Appellant.

Aug. 26, 1994.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before JOHNSON, BARKSDALE and DeMOSS, Circuit Judges.

JOHNSON, Circuit Judge:

This action arises out of an alleged hit-and-run accident involving plaintiff, Boyce Childs. Following this alleged accident, Childs retained appellant, Bruce Waltzer, to represent him in an action seeking benefits under the uninsured-motorist provisions in an insurance policy issued by defendant/appellee, State Farm. During the course of discovery, however, State Farm amassed substantial and compelling evidence that the alleged accident was in fact deliberately staged in order to secure the benefits of the policy. Despite this evidence, attorney Waltzer conducted little to no discovery and continued to sign pleadings in prosecution of the suit. Accordingly, State Farm sought sanctions against Waltzer for violations of Rule 11 of the Federal Rules of Civil Procedure. The district court ruled in favor of State Farm and imposed sanctions in the amount of $30,000. Finding no reversible error, we AFFIRM.

I. FACTS AND PROCEDURAL HISTORY

This litigation arises from the claim of plaintiff, Boyce Childs, that he was involved in a hit-and-run accident on May 17, 1988. This alleged accident took place at 1:30 a.m. on a remote portion of Highway 11 in the Parish of Orleans in Louisiana. According to Childs, after sustaining a glancing impact from an oncoming vehicle, he swerved, lost control of the van he was driving, and

ran off the road and into a tree. After the van hit the tree and Childs was able to exit the vehicle, Childs alleges that the van burst into flames and was completely consumed by fire.

Firemen and police responded to the scene of this alleged accident where they found a smoldering and dented van. Moreover, Childs was taken by ambulance to the hospital where he was treated for injuries to his face and chest.[1]

State Farm, which had issued an insurance policy covering the van, did reimburse Childs for his medical bills. However, it refused to provide any further benefits pursuant to the uninsured-motorist provisions of the policy. Accordingly, Childs retained the legal services of Bruce Waltzer to bring an action against State Farm to recover those benefits.

Waltzer brought this action, on March 12, 1990, in a Louisiana state court alleging that Childs was entitled to the benefits under the policy and that State Farm was in bad faith. State Farm removed the action to federal district court on the basis of diversity of citizenship. Moreover, in its answer to this suit, State Farm denied that any accident had occurred or that Childs' "incident" had involved a hit-and-run collision.

State Farm then began to conduct discovery to gather evidence to prove that no such accident had occurred. This discovery revealed that within the six months preceding the accident, Childs had purchased[2] no less than thirteen disability policies of insurance.[3] Moreover, it came to light that the van that Childs was driving was owned by Chris Taylor and the particular State Farm policy in issue had been purchased by Robert Jenkins. Taylor and Jenkins were personal friends and business associates of Childs and between them they had been involved in ten other "phantom vehicle" accidents which occurred under strikingly similar circumstances as the alleged accident involved in

---

[1]The medical records indicate that Childs was hospitalized for ten days with a broken nose, cuts to his forehead, and internal chest bruises.

[2]These policies were either purchased by Childs or were purchased by others for his benefit.

[3]In the event of an alleged disability, these policies would pay Childs directly on a daily or monthly basis. The policies would also pay off outstanding debts to creditors and would permit Childs to collect double and even triple recovery for a claimed disability.

the instant suit.[4]  In each case, the accident victims were protected by multiple insurance policies, in some cases as many as twenty, purchased within days or months prior to the accidents.[5]  Finally, State Farm discovered that Childs himself had been involved in a prior phantom vehicle accident in 1981 before which he had purchased twenty disability insurance policies within the nine months preceding the accident.[6]

Compounding the inference of fraud to be drawn from the great number of policies purchased and the timing of their purchase, State Farm produced many of the applications by which Childs procured these policies. These applications contained numerous omissions or misrepresentations[7] that obscured the number of insurance carriers with which Childs had coverage.[8]

Lastly, State Farm developed evidence through discovery which suggested that the physical evidence did not match the particulars of the accident as described by Childs.  First, Officer Furlong, the officer on the scene, testified in deposition that he found no debris, such as glass or metal fragments on the highway, which he would have expected if there had been contact with another vehicle.  Further, Officer Furlong stated that despite Childs' description of the severe or sharp turn made to avoid the collision, he found no tire marks, gouge marks or scrapes on the roadway.  Lastly, Officer Furlong noted that he found it unusual that the van burst into flames as a result of a frontal impact with a fixed object as this had never occurred during his thirteen years of investigation.

---

[4]State Farm terms these incidents "phantom vehicle" accidents because they all involved collisions with hit-and-run drivers and with no independent witnesses.

[5]Much of this evidence surfaced during the depositions of Taylor and Jenkins in November of 1990.

[6]The information that plaintiff had been involved in a prior phantom accident in 1981 was brought forth at the deposition of Boyce Childs in November of 1990.

[7]In particular, State Farm presented application sheets from several of the disability policies obtained by Childs in which he had either left blank or only listed one company when asked the question of with what other insurance companies do you have similar policies.

[8]Prior to his accident in 1981 before which Childs had purchased twenty policies of disability insurance, Childs had received a letter from Northwestern Mutual Life Insurance Company informing him that he was being denied coverage because the amount of disability income insurance that Childs already possessed exceeded the amount allowed for individuals within his occupational class.

State Farm also retained the services of three expert witnesses. These experts all cast doubt on Childs' version of the accident. Most telling is the report of Mervin A. Stringer, an expert in pyrotechnics, who stated that the dent located in the left side of the van was post-fire damage.[9] Additionally, the other two experts noted that the damage on the van was too high to have been caused by a head-on collision with a mid-size car as indicated by Childs, that it is very unlikely that a fire would have been caused by a frontal collision with a stationary object and that the van had rebounded away from the tree further than would be expected from an impact as described by Childs.[10]

After the development of much of this evidence, State Farm, in January of 1991, moved for leave to amend its answer to specifically allege fraud. In particular, State Farm alleged that Childs had deliberately staged the accident in an attempt to profit from the proceeds of the State Farm insurance policy. Without conducting any discovery, Waltzer opposed this motion. State Farm was granted leave, however, and did amend its answer.

The case proceeded to a trial setting in September of 1991 before Judge McNamara. On September 19, 1991, in accordance with the district judge's pre-trial notice, Waltzer and counsel for State Farm met over the course of several hours for the purpose of formulating an exhibit list for trial. During this meeting, all of the documentary evidence, including all of the many policies of insurance and the misleading application sheets, were reviewed.[11] Then, on the day of the trial setting, September 23, Waltzer filed a Motion for Partial Dismissal, dismissing the claim against State Farm for bad faith.[12] Waltzer continued to pursue the remainder of the claim, though.

---

[9]Stringer's opinion appeared in a letter dated June 12, 1991, that was made part of the record in a submission of expert reports on July 1, 1991.

[10]The reports of Douglas Robert, the accident reconstructionist, and of Charles E. Prewitt, a mechanical engineer, are dated January 3, 1991, and January 4, 1991, respectively. Further, they were attached as exhibits to State Farm's Motion to Review Magistrate's Ruling and Alternatively to Continue Trial filed on February 5, 1991.

[11]Based upon this meeting, a joint stipulation was reached in which Waltzer attested to the accuracy and genuineness of all the disability policies and that Childs had signed them.

[12]State Farm contends that this was a recognition that State Farm was not in bad faith. While this may overstate the inference to be drawn from this action, it clearly does show that Waltzer

The September trial did not occur. Instead, the trial was continued until April of 1992. In the interim, Waltzer again had an opportunity to conduct discovery to test the verity of State Farm's evidence. He did not avail himself of that opportunity, however.

On October 28, 1991, State Farm asserted a counterclaim against Childs seeking to recover the money it had paid to him prior to the onset of discovery. The basis for this counterclaim was that Childs had committed fraud by deliberately staging the accident. Without conducting any discovery, Waltzer signed and filed an answer to the counterclaim denying the assertion of fraud.

This case did eventually go to trial in April of 1992 before Judge Edith Brown Clement. After presentation[13] of the evidence, it took a jury less than two hours to find that Childs was guilty of fraud and to award State Farm damages on its counterclaim.

Following this trial, on June 18, 1992, State Farm moved for sanctions against Waltzer[14] for violations of Rule 11 of the Federal Rules of Civil Procedure. This led to a hearing on liability which took place before Judge Clement on October 21, 1992. At the end of this hearing, Judge Clement concluded that by late 1990 or early 1991, the evidence developed by State Farm had pretty well taken shape and was available to Waltzer. Judge Clement found this evidence to be overwhelming and clear. In light of this evidence, the court held that Waltzer failed to act as a reasonable attorney by failing to evaluate and recognize the clear proof of fraud in this case which led to Waltzer's failure to conduct a reasonable inquiry into his client's claims.[15] As Waltzer had not conducted a reasonable inquiry after the evidence of fraud became compelling, the court held that Waltzer had violated Rule 11 when, after this time, he signed three documents[16] that affirmed the merits of Childs' claim.

---

was by this time aware that the evidence of fraud against his client was substantial.

[13]At the trial, Waltzer only presented two witness—his client and a treating physician.

[14]State Farm also moved for sanctions against Childs, but that is not relevant to this appeal.

[15]Specifically, Judge Clement concluded that "had Mr. Waltzer conducted a modest amount of evaluation, an investigation into the facts of his client's claim against State Farm, he would have and should have determined that the facts to which he attested.... [were] false and void."

[16]The judge based her ruling on Waltzer's signature on the following three documents that she identified by name and date:

Accordingly, Judge Clement ordered Waltzer to pay, as a sanction, State Farm's attorneys' fees and costs incurred as a result of this violation beginning September 4, 1991. A separate hearing was held to quantify those fees and expenses. At that hearing, Judge Clement determined that State Farm had proved up an amount of reasonable fees and expenses totaling $46,462. However, she found that the sum of $30,000 would adequately represent an amount which would be an appropriate sanction and assessed that amount against Waltzer for his violations of Rule 11. Waltzer now appeals.

II. DISCUSSION

A. *Standard of Review*

We review all aspects of a district court's decision to invoke Rule 11 and accompanying sanctions under an abuse of discretion standard. *American Airlines, Inc. v. Allied Pilots Association,* 968 F.2d 523, 529 (5th Cir.1992). "A district court necessarily would abuse its discretion if it imposed sanctions based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Smith v. Our Lady of the Lake Hosp.,* 960 F.2d 439, 444 (5th Cir.1992); citing *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405-07, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). This is a deferential standard because "[f]amiliar with the issues and litigants, the district court is better situated than the court of appeals to marshall the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." *Cooter & Gell,* 110 S.Ct. at 2459.

B. *Rule 11 Liability*

Rule 11 was originally enacted in 1938 to curb tendencies toward untruthfulness in pressing a client's suit. Georgene M. Vairo, *Rule 11: A Critical Analysis,* 118 F.R.D. 189, 190 (1988). Despite this laudable goal, Rule 11 was largely ignored. *Id.* This changed in 1983, though, when growing concern over misuse and abuse of the litigation process prompted amendments to Rule 11. These amendments were designed to "reduce the reluctance of courts to impose sanctions by

1. The Pre-trial Order signed in September of 1991;

2. The answer to State Farm's counterclaim for fraud signed in January of 1992; and

3. The Amended Pre-trial Order signed in March of 1992.

emphasizing the responsibilities of attorneys and reinforcing those obligations through the imposition

of sanctions." *Thomas v. Capital Security Services, Inc.,* 836 F.2d 866, 870 (5th Cir.1988) (en banc).

Thus, at the time that this litigation was underway, Rule 11 provided, in pertinent part:

> The signature of an attorney ... constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper;  that to the best of the signer's knowledge, information, and belief formed after a reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any i mproper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation....  If a pleading, motion, or other paper is signed in violation of this rule, the court ... shall impose upon the person who signed it ... an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11 (West 1992).[17]

This Court has interpreted this rule to impose three affirmative duties with which an attorney

or litigant certifies he has complied by signing a pleading, motion, or other document.  These duties

are:

> 1) that the attorney has conducted a reasonable inquiry into the facts which support the document;
>
> 2) that the attorney has conducted a reasonable inquiry into the law such that the document embodies existing legal principles or a good faith argument for the extension, modification, or reversal of existing law;  and
>
> 3) that the modification is not interposed for purposes of delay, harassment, or increasing the costs of litigation.

*Thomas,* 836 F.2d at 874.  Compliance with these affirmative duties is measured as of the time that

the document is signed.[18]  Moreover, consistent with the purpose of the 1983 amendments, the

---

[17]Rule 11 was substantially amended in 1993.  The effective date of those amendments was December 1, 1993, though.  Since the conduct at issue here occurred prior to that date, the newly amended Rule 11 does not apply.

[18]Cases from this Circuit prior to the en banc decision in *Thomas* had held that an attorney had a continuing obligation to review and reevaluate his or her position as the case develops.  *See e.g., Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1127 (5th Cir.1987);  *Southern Leasing, Ltd. Partners v. McMullan,* 801 F.2d 783, 788 (5th Cir.1988).  Thus, a document that initially satisfied Rule 11 might later turn out to be the basis for sanctions if new facts were discovered which showed that there was no longer a good faith basis for the document.  *Robinson,* 808 F.2d at 1127.  The en banc Court in *Thomas* rejected this position, however.  836 F.2d at 874. Instead, the *Thomas* Court explained that liability for signing a document was similar to a snapshot.  Courts would focus on the instant the picture was taken—when the signature was placed on the document.  Liability under Rule 11 would only be assessed if at that instant in time

standard under which an attorney is measured is an objective, not subjective, standard of reasonableness under the circumstances. *Id.* at 873; *United States v. Alexander,* 981 F.2d 250, 252 (5th Cir.1993). An attorney's good faith is no longer enough to protect him from Rule 11 sanctions. *Robinson v. National Cash Register, Co.,* 808 F.2d 1119, 1127 (5th Cir.1987).

At issue in this case is the first affirmative duty—whether Waltzer conducted a reasonable inquiry into the facts underlying his client's claim. The district court herein concluded that the evidence of fraud developed by State Farm was clear and overwhelming. In light of that substantial evidence, the district court found that the investigation conducted by Waltzer to establish that his client's claim was well-grounded in fact was not reasonable. It is our task to determine whether this finding by the district court was an abuse of discretion.[19] *Smith,* 960 F.2d at 444. We conclude that there was no abuse of discretion.

When Waltzer initially signed and filed the original petition commencing this suit in March

the attorney or litigant was in violation of the rule. *Id.* However, as a practical matter, this was not a significant change. Virtually all suits will require a series of filings and Rule 11 applies to each and every paper signed during the course of the proceedings. *Id.* at 875. Accordingly, if facts are discovered that show that there is no longer a good faith basis for a position taken by a party, a pleading, motion, or other paper signed after those facts come to light reaffirming that position can be the basis of a violation of the rule.

[19]Mr. Waltzer attempts to obfuscate this issue in his brief to this Court by focusing on his evaluation of the evidence as opposed to whether he conducted a reasonable inquiry. Specifically, Waltzer argues that the district court erred in imposing Rule 11 sanctions because there existed in the record some evidence to support his client's claim. *See Brubaker v. Richmond,* 943 F.2d 1363, 1377 (4th Cir.1991) (to satisfy Rule 11, the allegation merely must be supported by *some* evidence). As some evidence supported his client, the evidence was conflicting. Thus, Waltzer contends that the district court abused its discretion by applying Rule 11 so as to force an attorney to resolve conflicting evidence against his client.

Whatever the merits of this argument, we do not find that Waltzer can take any solace in it. This is because it relies on an erroneous view of the district court's ruling. The basis of the district court's ruling was not that, *after a reasonable inquiry under the circumstances,* Waltzer's evaluation of conflicting evidence was sanctionable. Rather, the district court ruled that Waltzer *had not conducted a reasonable inquiry under the circumstances.*

Waltzer wishes to argue that evaluation of this evidence does not inexorably lead to the conclusion that Childs committed a fraud. Even if this is so, the evidence of fraud was sufficient, at a minimum, to prompt a reasonable attorney, aware of his obligations under Rule 11, to conduct a further inquiry before he singed a paper and thereby certified to the court that the claim was well-grounded in fact. It was this inquiry, or lack thereof, that the district court found deficient.

of 1990, he had conducted a sufficient inquiry to satisfy Rule 11. He had interviewed his client, inspected the vehicle, visited the accident site, interviewed a fireman from the scene, interviewed the reporting officer, obtained the police report and reviewed the medical records. This inquiry supported his client's claim that a hit-and-run accident had occurred. Thus, at that time, Waltzer could, within the bounds of Rule 11, sign a document certifying to the court that to the best of his knowledge, information and belief, formed after a reasonable inquiry, his client's claim was well-grounded in fact. Fed.R.Civ.P. 11.

During discovery, however, State Farm began to amass significant evidence that the alleged accident had been staged. As earlier detailed, this evidence included the information that Childs and his associates Taylor and Jenkins had been involved in numerous phantom vehicle accidents before which they had purchased multiple policies of disability insurance, sometimes as many as twenty. Further, the evidence showed that, in order to secure the thirteen disability policies purchased prior to the instant accident, Childs had made several misrepresentations or omissions on the application sheets to camouflage the number of disability policies he carried. Lastly, the testimony of the investigating officer and State Farm's three expert witnesses seriously challenged whether the accident could have occurred as Childs claimed.

The district court, which is in a better position than we are to make such an assessment as it has seen the witnesses and heard the attorneys, concluded that this evidence of fraud was clear and overwhelming. As the record discloses that this evidence was substantial, we cannot say that this assessment was clearly erroneous and thus an abuse of discretion. Moreover, while it was being developed, Waltzer could not just cling tenaciously to the investigation he had done at the outset of the litigation and bury his head in the sand. Instead, the evidence gathered by State Farm became a factor in the district court's determination of whether, under the circumstances, Waltzer had conducted a reasonable inquiry into the facts supporting the claim. Thus, to satisfy his obligation under Rule 11 to conduct a reasonable inquiry to determine if his client's claim was well-grounded in fact, Waltzer's investigation would have had to take into account State Farm's evidence of fraud.

According to Waltzer, the investigation he undertook that was in response to this growing

wealth of evidence of fraud consisted of the following:

1. interrogating Childs as to whether Childs had staged the accident;

2. attending the expert inspection of the vehicle;

3. reviewing the expert reports;

4. reviewing the various policies of insurance held by Childs;

5. interviewing all of the alleged co-conspirators;

6. interviewing witnesses to Childs' prior accident in 1981;

7. reviewing the police reports from alleged co-conspirators prior accidents;  and

8. attending and/or participating in numerous depositions.

The district court found that, under the circumstances, this inquiry was not reasonable and thus that Waltzer had violated Rule 11.

We must agree that this inquiry was deficient.  State Farm's evidence of fraud was powerful, and yet, all of Waltzer's investigative efforts can be summed up as asking Childs and his alleged co-conspirators if they were frauds and reviewing the evidence.  Never did Waltzer conduct any affirmative discovery to test the verity of the evidence developed by State Farm.  He never conducted a single deposition.[20]  He never sent out any interrogatories, requests for production or requests for admission.  Lastly, he never hired his own experts to support his client and to refute the damaging reports by State Farm's experts.  In light of the compelling evidence of fraud in this case, Waltzer's inquiry cannot be said to be reasonable.

This conclusion is bolstered when we apply the factors this Circuit has developed to determine whether an attorney has made a reasonable inquiry into the facts sufficient to satisfy Rule 11.  These factors are:

1. the time available to the signer for investigation;

2. the extent of the attorney's reliance upon his client for the factual support for the document;

3. the feasibility of pre-filing investigation;

---

[20]Waltzer did notice the deposition of one of State Farm's expert witnesses, but that deposition was never taken.

4. whether the signing attorney accepted the case from another member of the bar or forwarding attorney;

5. the complexity of the factual and legal issues;  and

6. the extent to which development of the factual circumstances underlying the claim requires discovery.

*Thomas,* 836 F.2d at 875;  *St. Amant v. Bernard,* 859 F.2d 379, 383 (5th Cir.1988).  We find that these factors weigh in favor of the district court's ruling that Waltzer did not conduct a reasonable inquiry before he signed the documents that the district court found to be violative of Rule 11.

First, Waltzer had ample time to conduct a reasonable inquiry into State Farm's allegations of fraud.  State Farm alleged in its original petition that no accident had occurred and the evidence of fraud developed over the course of the litigation.  In all this, time Waltzer could have easily conducted any kind of investigation or discovery.

Next, Waltzer relies heavily on his client's representation that the accident was not staged[21] and the representations of Childs' alleged co-conspirators that there was no fraud.  However, it was not reasonable for Waltzer to have believed that Childs and his co-conspirators would simply confess to what amounts to a criminal offense.[22]

Also, Waltzer complains that the factual and legal issues were complex and notes that State Farm, in its brief to this Court, describes the facts as "labrynthian."  The issue, however, has always been clear—did his client stage an accident in order to defraud an insurance company?  Moreover, adjectives used such as "complex" or "labrynthian" describe State Farm's difficulty in compiling and organizing this evidence.  Once this evidence was compiled and organized, though, it was clear and direct.  In fact, the jury managed to figure it out in less than two hours.

Accordingly, we conclude that the district court did not abuse its discretion when it found that

---

[21]In the Rule 11 liability hearing Judge Clement asked Waltzer the following question:

> Judge Clement:  So, basically your defense [to Rule 11 liability] says that you relied on Childs' representations to you, that he was not involved.
>
> Mr. Waltzer:  Yes, your Honor.

[22]In fact, one of the alleged co-conspirators, Robert Jenkins, was subsequently taken into custody by federal agents for charges including possible insurance fraud.

Waltzer had failed to conduct a reasonable inquiry to determine if Childs' claim was well-grounded in fact. While Childs' claim was initially supported, in light of the impressive evidence of fraud presented by State Farm, Waltzer could not, without a more substantial investigation, blithely continue to sign pleadings thereby certifying to the court that to the best of his knowledge, information, and belief, Childs' claim was not fraudulent.[23] Waltzer's failure to conduct such a reasonable pre-filing inquiry supports the district court's finding that Waltzer violated his affirmative duty under Fed.R.Civ.P. 11.[24]

C. *Waltzer's Testimony at the Liability Hearing*

On October 21, 1992, Judge Clement held a hearing to determine liability under Rule 11 against Waltzer. According to Waltzer, this hearing was merely set for the attorneys to present oral arguments. However, Waltzer relates that, in the midst of his attorney's argument, the judge turned the hearing into an evidentiary hearing and required Waltzer to take the stand. Therefore, Waltzer contends that, as this was a surprise and he was not prepared to testify, the judge's actions violated his due process rights. There is no merit in this contention.

It is true that Rule 11 sanction decisions must comport with due process. *Spiller v. Ella Smithers Geriatric Ctr.,* 919 F.2d 339, 346 (5th Cir.1990); *Donaldson v. Clark,* 819 F.2d 1551, 1559-60 (11th Cir.1987) (en banc). This requires notice and an opportunity to be heard before the imposition of Rule 11 sanctions. *Veillon v. Exploration Services, Inc.,* 876 F.2d 1197 (5th Cir.1989); *see also Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (procedural due process ordinarily requires notice and an opportunity to be heard). The requirement of an opportunity to be heard, though, does not require an elaborate or formal hearing. *Spiller,* 919 F.2d at 347. Simply giving the individual accused of a Rule 11 violation a chance to respond through the submission of a brief is usually all that due process requires. *Id.; Veillon,* 876 F.2d at 1202.

---

[23]*See Southern Leasing,* 801 F.2d at 788 (when a lawyer learns that an asserted position, even if originally supported by adequate inquiry, is no longer justifiable he must not persist in its prosecution).

[24]*See Matter of Ulmer,* 19 F.3d 234, 237 (5th Cir.1994) (failure to conduct adequate inquiry into the law is an independently sufficient basis for the imposition of sanctions).

In this case, the transcript of the hearing does not bear out Waltzer's assertion that the judge forced him to testify. Instead, the record shows that during the hearing, the judge stated that it would be helpful for Waltzer to explain certain things. Waltzer's counsel then protested that Waltzer was not prepared to testify. Accordingly, the judge stated that if Waltzer had nothing he wished to put in the record, then she would decide the matter on the briefs. The judge informed Waltzer's attorney of the type of questions she would be asking and she inquired whether Waltzer's attorney desired a recess to discuss the matter with Waltzer. A several hour recess was taken after which, without objection, Waltzer's attorney chose to put Waltzer on the stand.

We see no violation of Waltzer's due process rights here. The judge could have ruled solely on the briefs. *Spiller,* 919 F.2d at 347. That she granted a hearing and further gave Waltzer an opportunity to take the stand afforded Waltzer more due process than was necessary, not less.

D. *Notice*

Under *Thomas,* once a district court finds a Rule 11 violation, it must impose some sanction. *Thomas,* 836 F.2d at 876; *Willy v. Coastal Corp.,* 855 F.2d 1160, 1172 (5th Cir.1988). The district court retains broad discretion in fashioning an "appropriate" sanction, *Thomas,* 836 F.2d at 876-77; *Estiverne v. Sak's Fifth Avenue,* 9 F.3d 1171, 1174 (5th Cir.1993), however, that sanction should be the least severe that adequately furthers the purpose of Rule 11. *Akin v. Q-L Investments, Inc.,* 959 F.2d 521 (5th Cir.1992).

The rule specifically provides that reasonable and appropriate expenses, including attorney's fees, may be awarded as a sanction to the extent the expenses were reasonably caused by a violation of the rule. Fed.R.Civ.P. 11 (West 1992). Actual expenses and attorney's fees are not necessarily reasonable, though, because "[a] party seeking Rule 11 costs and attorney's fees has a duty to mitigate those expenses, by correlating his response, in hours and funds expended, to the merit of the claims." *Thomas,* 836 F.2d at 879. Moreover, the appropriate sanction in a given case may be an award to the adversary of some amount less than all of its reasonable expenses incurred as a result of the violation. *Smith International, Inc. v. Texas Commerce Bank,* 844 F.2d 1193, 1197 (5th Cir.1988).

In this case, Waltzer contends that the amount awarded is not appropriate because State

Farm failed to provide prompt notice of the alleged violation to him and to the court. Further, Waltzer alleges that the district court, when it was determining what would be an appropriate sanction, failed to take this into account in mitigation.

This Court recognized in *Thomas* that, according to the express language of Rule 11, if the award is the reimbursement of an opponent's expenses, those expenses must be both caused by the violation and reasonable. *Thomas,* 836 F.2d at 878-79. Moreover, the *Thomas* Court instructed that the "reasonableness" finding necessarily embraces an inquiry by the court into the extent to which the non-violating party's expenses and fees could have been avoided or were self-imposed. *Id.* at 879; *Willy v. Coastal Corp.,* 915 F.2d 965, 968 (5th Cir.1990), *aff'd,* --- U.S. ----, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992). These expenses may be self-imposed if the non-violating party fails to take steps to mitigate them. One step that a party seeking sanctions must take is to give notice to the offending party and the court promptly on discovering the violation. *Thomas,* 836 F.2d at 879; Fed.R.Civ.P. 11 advisory committee notes. The hope is that early notice can deter continuing violations, thereby saving time and judicial resources. *Donaldson,* 819 F.2d at 1560. Failure to give prompt notice of an alleged violation may result in a reduced sanction award. *Thomas,* 836 F.2d at 879.

However, this notice can be very informal. It may be in the form of a personal conversation, a telephone call or a letter. *Id.* at 880. In addition, in a case such as the instant case where the attorney is said to have submitted a claim without any basis in fact, Rule 11 itself provides imputed notice. *Veillon,* 876 F.2d at 1202; *Spiller,* 919 F.2d at 346; *Donaldson,* 819 F.2d at 1560; *McGregor v. Board of Comm'rs,* 956 F.2d 1017, 1023 (11th Cir.1992).[25]

As Waltzer herein admits, State Farm did give him oral notice of its intent to seek Rule 11 sanctions on two separate occasions prior to trial. While it appears that these notices did not come until early 1992, shortly after the pre-trial conference before Judge Clement, it is clear from the record that this was a great concern to Waltzer well before that time. In the face of State Farm's impressive evidence of fraud, Waltzer obviously became worried about the consequences of pressing a claim that

---

[25]*But see Jensen v. Federal Land Bank,* 882 F.2d 340, 341 (8th Cir.1989); *Tom Growney Equipment, Inc. v. Shelley Irrigation Dev., Inc.,* 834 F.2d 833, 836 n. 5 (9th Cir.1987).

was not well-grounded in fact. Accordingly, Waltzer testified that on two occasions he called in Childs to "read him the riot act." This consisted of grilling Childs to see if he was lying and warning Childs of the dire consequences of not telling the truth. The first time that Waltzer called his client in to "read him the riot act" was when State Farm made its offer of judgment in July of 1991. Waltzer then called his client in again to reinterrogate him after the pre-trial conference in 1992. Thus, it seems clear that as early as mid-1991, Waltzer was aware of the consequences submitting a claim that is not well-grounded in fact.[26]

Moreover, even if this notice was not sufficiently prompt, we find that the district court did take this into account in mitigation. First, although State Farm began incurring costs in April of 1991 and the district court found that the evidence of fraud was overwhelming by early 1991, the court did not begin the running of the period for which sanctions were to apply until September 4, 1991. Further, while the judge found that State Farm's actual expenses and fees during the relevant time were $66,203.71, she granted many of Waltzer's objections to arrive at an amount of reasonable expenses and fees of $46,462. Then, although she emphasized that this was a very serious violation of Rule 11,[27] she did not award this entire amount. Instead, she reduced the award to $30,000. Accordingly, in light of the notice actually given, the imputed notice of Rule 11 itself, Waltzer's obvious awareness of the consequences of submitting a claim not well-grounded in fact and the district court's reduction of the award to an amount well below the reasonable expenses and fees, we find no abuse of discretion.

---

[26]That Waltzer was aware that the Rule 11 motion was coming and that Mr. Waltzer thought that he could beat it is shown in the following interplay between Waltzer and his attorney at the liability hearing before Judge Clement:

> Mr. Weidenfield: Did you or did you not expect the Rule 11 Motion to become? (sic).
>
> Mr. Waltzer: Yes.
>
> Mr. Weidenfield: Were you on a suicide mission?
>
> Mr. Waltzer: No, I was not.

[27]In fact, the judge felt that Mr. Waltzer's conduct was even "more egregious than simply conducting no discovery or failing to make a reasonable inquiry, as is prohibited by Rule 11."

Lastly, we turn to an argument that counsel for Waltzer made at oral arguments. There, for the first time, counsel for Waltzer argued that the district court's findings were not sufficiently specific.[28] As this argument was not raised or argued in the briefs before this Court, it has been waived and we will not consider it. *In re Texas Mortg. Services Corp.,* 761 F.2d 1068, 1073-74 (5th Cir.1985); *Franceski v. Plaquemines Parish School Board,* 772 F.2d 197, 199 n. 1 (5th Cir.1985); *Bank One, Tex., N.A. v. Taylor,* 970 F.2d 16, 27 (5th Cir.1992).

III. CONCLUSION

The evidence of fraud developed by State Farm in this case was compelling. In light of that evidence, Waltzer's inquiry to determine whether Mr. Child's claim was well-grounded in fact, which consisted mainly of asking his client and his alleged co-conspirators if they were lying and reviewing the evidence developed by State Farm, was not reasonable. Accordingly, the district court did not abuse its discretion in ordering sanctions against Waltzer. AFFIRMED.

---

[28]*See Topalian v. Ehrman,* 3 F.3d 931, 936 (5th Cir.1993) (vacating and remanding a large sanctions award for lack of sufficiently specific findings).